Our fifth case for this morning is D. U. v. Rhoades. Mr. Underwood. Good morning, may it please the court. I'm Norm Underwood Jr. on behalf of D. U. and just for the record D. U. is D. U.'s natural guardian. This matter sought an injunction in the Eastern District of Wisconsin to enforce what is termed the specifically under Medicare and it was denied and we immediately appealed. Mr. Underwood, the state pointed out at page 18 of the reply brief that D. U. could have timely appealed the denial of private duty nursing through Wisconsin's administrative appeal process and also through judicial review in the state. Why did D. U. forego those possible avenues of relief? One, because D. U. is a minor and she falls squarely in the parameters of the federal law EPSDT mandate. Might I ask you to keep your voice up? Speak up and I'm also just going to comment that the state administrative authorities and the state courts are obviously obliged to follow whatever federal law mandates take part in these decisions so I'm not sure that that's an answer to the question. Well, yes, I'm sorry and I'll speak louder. Having had experience with administrative agencies, the Department of Hearing and Appeals, there's no effort frankly to apply the EPSDT mandate. In fact, there's no real effort to imply the medical necessity standards under the Wisconsin statute. Third, it's a federal question and I think it's PEPC case, I'm not sure if that, although they didn't state it, if their position is I didn't exhaust my remedies or I'm sorry, D. U. didn't exhaust her remedies, that does not have to exhaust her remedies. It's a federal question and the thinking... I understood this to be more a question about availing oneself of everything that's out there more than whether there's a lack of federal jurisdiction. I don't think any of us was worried about that, but if it's one of these very granular questions about whether somebody needs 70 hours a week of highly actually something more like 21 hours a week would do with less skilled care the rest of the time, this is very specialized and particularized knowledge that the states deal with all the time. I beg to differ. They do not and here's why and I don't mean this disrespectfully. The judge, administrative law judge, who simply do not understand the federal statute and from my experience they don't even apply the state statute. In other words, there's, excuse me now, there's elements under the medical necessity standard, the last personal knowledge, the last attempt I made to appeal a modification of personal care, I'm sorry, for some therapy on behalf of DU, the response I received did not apply medical necessity under the state statute and in no way under any circumstances did it apply EPSDT. Okay, let me ask you this. This is an interlocutory appeal. Yes. From the denial of preliminary... Oh, I'm sorry, sorry to cut you off. There was one other strategical issue why bypassing the state appellate system because in part there was a reliance here on a Moore case from the 11th Circuit and that's precisely the actions those attorneys took in that case. They withdrew their state claim and filed the federal action. Okay, so actually maybe this is a couple of questions. One of them is focusing on the fact that it's a denial from a preliminary injunction. Our standard of review is actually quite deferential to what the district court did and one has to show irreparable injury. Well, it's my understanding from the filings that the care level that you think is appropriate is being furnished with private funds right now. Why couldn't they just be reimbursed if you were to win at the end of this case? I'm sorry, Your Honor. Why couldn't the money that you're spending right now that you think, on services that you think the state should be giving you, why can't that just be reimbursed to the litigation trust fund at the end of this case if you do prevail? Because if money will make you whole, then the classic standard would say that there's no irreparable injury. The money will flow back into the litigation trust. It'll be there for whatever future needs she has. I'm not sure there's a mechanism for that. How about a federal court order? Well, I'm sorry, in the state of Wisconsin when you say reimbursement, one, and two, that doesn't... You don't think a federal court would have the power to say she should have been getting this money? No, I misspoke. I'm sorry. I didn't know. I'm not aware of the state of Wisconsin having a mechanism to reimburse trust funds expended on behalf of a recipient. Right, no, but my question is premised on the fact that here we are in this case. This is the case you brought. The district court didn't see that there was irreparable harm because the district court thought that if you were to prevail on your federal theories and the other theories that you've brought, then the money the state wrongfully withheld from you could simply be given to you. Maybe I'm wrong. Maybe I didn't apply the harm element. The district court, well we are asked to review the denial of a preliminary injunction and one of the key factors is whether there's irreparable harm. There's also a likelihood of success in the merits factor. Suppose we agreed with you that you kind of move the needle over that line. There still is the need to show you're likely to succeed in the merits, you're likely to suffer irreparable harm without the injunction, then you balance, you know, harms with harms without. All of that's relevant to our review. I understand, but the district court did not apply. She, the judge, limited her analysis to likely to, not likely to succeed on the merits. She didn't go through the other elements. But why does that mean you automatically get a reversal if we were to decide that you have irreparable harm? It's not like it wasn't argued by the state. The state said we have a lot of reasons. She just didn't happen to reach it. It's our opinion, it's our argument here that she should have applied, the judge should have applied, the entire preliminary injunction test and not only one element of it. But why, if you have to succeed on elements, you know, I'll be and it's an and situation, you have to succeed on all four of them. As soon as you fail on one of them, you've failed. It's not like they're in the alternative. Well, if you, the way I view it is two prongs. You have the medical part of it, you have the financial part of it. The financial part of it is a special needs trust. How large is the trust? Meaning, what it's worth? Yeah. It's not worth anything. It was set up primarily because it was a lawsuit, structured settlement, special needs trust for the sole purpose. That's not my question. I just asked you how large is the trust. There's no value to it. There's no value. It's paying out tens of thousands of dollars. So there must be, it's coming out of some pot of money. And I'm asking you how large it is. The trust itself, standing alone, has zero value. There's a, if I may... But money is coming out of the trust to pay your expense? There's a monthly annuity payment, structured settlement payment. So what's that about? That's the, the trust is the payee for that. But you asked about depletion. The funds have in fact been depleted. Well, you're not answering Judge Posner your question. It's such a simple question. There's, you know, either you can describe what the annuity is, how many years, you know, month to month, what the present value would be. I mean, your point in part is here we are paying this money privately and we're going to burn through it if we don't have the state. So what's it? The value of the trust, Your Honor, sorry, is about $9,000 a month is what, the trust is the payee of that amount. Forever? Forever? For 40 years. Look, this, you talk about depleting the funds. That implies that there is some sum which gets depleted every month. And I'm just asking what is that sum? $9,000. No. That's what it costs to care for DU. You're being totally unresponsive. You talk about money being paid for her expenses, depleting the trust. Yes. When the matter was set. And now you're saying what? When you say $9,000 a month, that's not the value of the trust. The trust must have some value which is diminishing as money is paid for her treatment. So would you just tell me what that sum is that's being depleted? It's already been depleted. It was $100,000. So there's no more money for her? No. You've run out of money? Yes. So what is the $9,000 times 40? It's an annuity payment. The present monthly payment now is $9,400 and some change. But, well, yeah, I'm missing something. All right. Well, your time has expired, so I think unless you have one final sentence you'd like to leave us with, we'll move on to the state's argument. I do not. All right. Thank you very much, then. Mr. Murphy. May it please the Court, my name is Mike Murphy. I have a question for you, Mr. Murphy. Could you answer that question? Do you know what the trust is worth? I truly don't. I'm sorry. So my question is, suppose when the state does this evaluation, they decide, as they did, that the child doesn't need the 70 hours a week of skilled nursing care. Is there a mechanism under state law to give her, you know, my hypothetical was 21 hours a week of skilled care if a skilled nurse came in for 3 hours a day, 7 days a week, or to somehow have some lesser amount than the 70? With different skill levels, so you get some skill, you get some LPN, maybe you get some just, you know, home worker. The short answer is yes, but it requires a little bit of explanation. Private duty nursing is 8 hours or more per day, and that's a category that's sort of at issue in the authorization here. There is another type of nursing called intermittent nursing that can be 20 hours a week, 20 hours a week. So you'd have to put yourself in the intermittent nursing box if you had a person who had a need for less than 8 hours a day of the skilled level, but it's not just 0 or 8. There's some way to be in between. That's right, and there'd have to be an application for that intermittent nursing, but that is a possibility under the structure, yes. So did DU go from 70 hours of skilled to 100% of the time with somebody with no training at all? Well, not with no training at all. She went to a personal care worker, which is a less skilled level. It's some degree of skill, but it's less than an RN. We're going from an RN to less than an RN is what's happening here. Less than an LPN even, I would imagine, a personal care worker. I think you're right. Well, DU contends that personal care workers are unlicensed, untrained, have to be directed by a doctor or a nurse. First of all, I'm wondering if that's an accurate description, and if so, are DU's personal care workers being directed by a doctor or a nurse? Preliminary injunction stage here, not all that's been fleshed out. My understanding is that personal care workers are trained to the extent they work for organizations who employ them and supervise them. They are not RNs or LPNs. I don't think that it's the equivalent of someone who doesn't know how to take care of someone as far as zero skill, but it's certainly a lower level of skill. But she was getting all kinds of therapies. She was getting hippotherapy and aquatherapy and different kinds of things to assist her. I'm sorry. Those are independent of the nursing. Therapeutic services are another category of care that's separately authorized, separately provided. What the affidavit or the declaration here, it's Nurse Robert's declaration, makes reference to taking her to hippotherapy. What is important about that is that a skilled, licensed nurse was driving her to these places back and forth. Independent of that is whether she gets to go to therapy. It might be a personal care worker who drives her to that therapy instead of an RN. So the state took the position that who was driving the car didn't matter, or in a sense that it was something that could be done just as effectively by a personal care worker. Does not require an RN. That's exactly right. Well, does the record tell us if DU has a need for some level of skilled nursing, something less than eight hours a day? And if so, is she receiving those services? She is not receiving Medicaid funding nursing right now, skilled nursing, private duty nursing right now. What weight should we be given to this statement by the registered nurse Karen Roberts? It's not dated. Well, it is dated. Is this old? The declaration? I have no idea. This showed up as a filing in the court. I agree we don't know the date. Well, isn't it rather critical? The ailments described in this are ghastly. Now, on the other hand, there's the stuff that says she's made tremendous progress and so on. That's why the date of this is constant vomiting and spasms and screaming and using one arm. I mean, a couple things in response. I think the declaration... Left to her own devices to propel her wheelchair. She hits objects. I'm sorry. The substance of the declaration on its face does show that full-time skilled private duty nursing isn't necessary. For things like hitting objects with her wheelchair, it does not require an RN to help with that function. But Dr. Sundararajan doesn't seem to share that view. I mean, she's phrased her view softly. But not all doctors understand how to speak lawyer speak as well as maybe they should. She says it's her belief that DU has made such astounding gains, in large part due to the 70 hours of skilled nursing she receives each week, and the nurses are able to fine-tune on a minute-to-minute basis. And she says, I would propose if we aspire for DU's continued improvement, which sounds like a motherhood and apple pie statement, of course you'd want her continued improvement. She will require at least 70 hours of skilled nursing a week. Yeah, the 70-hour number is used twice in that letter. You read them both. But the first one talks about past gains that have been made. She did receive private duty nursing for years. And past progress cannot necessarily mean the same thing has to be done going forward. It does and it doesn't. I mean, you know, she's saying, suppose, to take the counterfactual, suppose she had been getting 70 hours of skilled nursing for a number of years and she was just flat-lined. You know, she wasn't getting any better. You know, it depends on the nature of the injury. So some people might be in that position. So you might make the inference, if that were the case, that it's really not going to help to keep on with the 70 hours a week because it's just not making any difference, and you would draw an inference from your experience. Dr. Sundararajan says it's exactly the opposite with D.U. In D.U.'s case, she's making great progress so far with the 70 hours. So she projects the possibility, the second half of the statement, looking into the future that if we keep this up, there's going to be room for further significant progress. So you're not just throwing your dollars away. It's worked in the past. We don't seem to have hit the ceiling yet. So let's keep doing it. Yeah, I think there's two important points in response. First, in that all the evidence, including the doctor's letter, do talk about D.U. getting much better, and it's reasonable to suggest that the level of care that she needs would change as well. Look, I don't understand. This 78-paragraph statement by Nurse Roberts said it was filed in September 2014. It doesn't know when it was written. But it describes a person who's essentially helpless. Now, is this false? Can't walk? I mean, she can't do anything. I don't have any reason to think. We have no cross-examination here, no reason to think that this is inaccurate for whatever it was. But if it's accurate, it suggests that she needs continuous attention from someone who's an expert and can deal with all sorts of ghastly stuff. She says, multiple post-traumatic hydrocephalus, post-traumatic seizure disorder, general epilepsy with myoclonic seizures, right spastic hemiparesis, parietal occipital shunt, visual hearing disorder, spastic cerebral palsy dysplegia, incontinence of bowel, bladder, early puberty, development in cognitive delay, vocalization and speech delayed, nonverbal, limited fine motor and gross motor abilities, apaxia, dyspraxia, ataxia. If that's true, and this is every day, she needs a lot of help from a skilled nurse. And it's hard to see why the district court would say there was no likelihood of success on the merits to get back to the preliminary injunction standard. It's hard to see why that describes a person whose likelihood of success in the merits is so poor that they don't pass the preliminary injunction standard. You don't have to prove your case to get a preliminary injunction. It's called a likelihood of success. Better than negligible. A couple things in response. DU is authorized to get full-time care right now. It was 96 hours a week at the time of the record. I believe it's been increased a little bit. So it's not as though she's not getting full-time help. And the Roberts declaration is important to show what she has been doing with prior authorizations for skilled care. I monitor and assess foods and liquid intake daily. DU is not able to communicate when she's hungry or thirsty. Liquids are offered every two hours. Drinking cups are changed daily. It does not take an RN to set a two-hour timer and put a clean glass of water in front of someone. But to feed her might take an RN. It sounds like swallowing could be an issue. So what that says is DU's hand-over-hand technique to attempt self-feeding skills. There's no doubt that the person in the home needs to help DU eat. It does not take a skilled nurse to help someone eat. Well, you say so, but why are you the qualified person to assess where the skilled nurse is necessary and where, you know, just a layperson, essentially, with a little bit of training about maybe taking a catheter in and out? I am not. Kelly Townsend is, and the state regulations that make the distinctions between skilled and unskilled care do. And the declaration of Kelly Townsend, who is a registered nurse, who is familiar with the standards, has filed her declarations explaining the difference between skilled and unskilled care, explaining the months of notice and transition time given, and explaining why medical necessity for... You said that the Robert... You were not challenging the Robert's 78-paragraph description of what she does. She, the registered nurse, does all these 78 things. And they seem to be, you know, not simple enough. They're all medical. I disagree. He says, for example, DU needs consistency to increase her cognitive abilities. She is not able to independently communicate. Now, that is extremely serious. Not able to independently communicate?  These may be refuted. But the question here is whether it's 70 hours a week. And let me read you something else from her declaration. Wait, I'm not... You're speaking too fast. I'm sorry. The issue, the decision here is not whether no skilled nursing care is appropriate here. It's whether 70 hours a week of a full-time private nurse is necessary. And this declaration shows what that past 70 hours has been used for. And it includes, I transport and assist DU to hippotherapy. You don't have to be an RN to drive. There are many things. But the reason, don't they argue, though, that en route from the home to the hippotherapy, what if she were to have a seizure? What if she were to... I mean, if these things can pop up at any moment, then you can't say, well, you know, DU, just be calm for the next 20 minutes while we're driving over to where the horses are. Because she can't. So things could happen at any time. So if the skilled person is the one at the wheel, they can pull over by the side of the road, there could be an immediate intervention, and all would be well and on they would go. This is a very fact-specific case. But one thing the affidavits explain is the type of seizures being alleged, if they do occur, are not the type of seizure that you associate with that word. It's an eye seizure, a visual seizure, that does not result in any loss of consciousness or a seriously hazardous situation. So I take the point to be broader, but this is a fact-intensive case, and the district court reviewed all the facts and made the right decision. I'd be happy to answer any more questions. I do see my red light is on. I don't think so. Okay, so thank you very much. I believe your time expired. Do you have one statement? I wanted to clarify the question that Judge Polzner asked me. The present value of the trust is $269. There's an investment fund from Charles Schwab that initially contained $100,000 in December of 2007. It was a settlement and a lawsuit. Part of the proceeds were used to put in that fund. When the state denied nursing in November 2013, it was about $40,000 in the account. I, as trustee, drew on that in an effort to maintain her care because at that point we had another nurse and another caretaker, so the U.S. always supplemented her care from the onset. With respect to the affidavit, that affidavit or declaration was attached to the reply in the lower court, I'm sorry, the reply, which is what the judge references in her ruling, but it was also attached to a reply brief with specific elements of the medical necessity standards and the facts outlined in Ms. Roberts' affidavit. And just your discussion, Your Honor, with respect to de-use care is precisely what the mandate goes to, to prevent the matters from getting worse, to prevent her condition from getting worse. And the point about the doctor's letter was precisely that because here's the theory, and you mentioned it, Your Honor, they will not pay for it if she's not making progress. If she's making progress, they will pay for it, and that's what you have to show when you submit the paperwork. That's what Dr. Sondra Rayson meant. Not his position is that, well, she's at a point now where she's fine, she no longer needs it. One final point. Eighty percent of brain development occurs by the age of three. DU has a severe brain injury that occurred at three. So I respectfully ask the court to remand with directions and grant the injunction. Thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.